| | |
|---|---|
| UNITED STATES OF AMERICA | Honorable Richard J. Sullivan |
| v. | Docket No. 16-cr-522 (RJS) |
| JOSEPH MERLINO | |

## SENTENCING MEMORANDUM ON BEHALF OF THE DEFENDANT JOSEPH MERLINO

The defendant, Joseph Merlino, respectfully submits this Memorandum in support of his position that he be sentenced, in uniformity with nearly 86% of the co-defendants in this matter, to time served with a period of home confinement. Alternatively, in the event the Court determines that a period of incarceration is warranted then it is our position that Merlino be given a credit of 4 months, reflecting unnecessary incarceration he has already served following a revocation of his supervised release entered by a District Judge for the Third Circuit on October 20, 2014, and that he be permitted to serve one-half of any sentence on home confinement, pursuant to USSG § 5C1.1(d). (PSR ¶ 127 & pg. 41). Sentencing is currently scheduled for October 17, 2018.

## INTRODUCTION

Joseph Merlino ("Merlino") was arrested on August 4, 2016 in connection with the above captioned indictment. Merlino thereafter spent eight days in federal custody in the Southern District of Florida and was released on a $5,000,000.00 bond, with a litany of restrictions. Throughout the pendency of this matter, Merlino has meticulously

complied with all conditions of his release. On January 29, 2018 trial commenced in this matter, which resulted in a hung jury. On April 27, 2018, the government and Merlino entered into a plea agreement, whereby Merlino entered a guilty plea to Count 4 of the indictment, in violation of 18 U.S.C. § 1084 and 2 (the transmission of betting information across state lines). Out of 46 co-defendants, Merlino was *one of only two* defendants (Frank Trapani the other) to receive such an offer from the government. (PSR "Status of Co-Defendants" Chart pgs. 7-13). This resolution was the result of an analysis by the government of its actual proofs, or lack thereof, cultivated through thousands of hours of recordings made by its star witness, John Rubeo ("JR"), over a three-year period. For the reasons set forth in this Memorandum and the documents attached hereto, the defense respectfully requests this Court to impose a sentence which is sufficient – but not greater than necessary to comply with Merlino's conduct in this case.

## LEGAL ARGUMENT

### A. LEGAL STANDARD

The oft-cited procedural requirements of post-Booker sentencing, laid down by the Supreme Court in Rita v. United States, 551 U.S. 338 (2007), are discussed in the Third Circuit's decisions in United States v. Cooper, 437 F.3d 324 (3d Cir. 2006) and United States v. Gunter, 462 F. 3d 237 (3d Cir. 2006). Briefly, sentencing courts must properly calculate the Guideline range; rule on any departure motions made under the Guidelines; and exercise post-Booker discretion by choosing a sentence in light of all relevant § 3553(a) sentencing factors, "regardless [of] whether [the chosen sentence] varies from the sentence calculated under the Guidelines." Gunter, 462 F.3d at 247.

When engaging in <u>Gunter's</u> final step, the court is free to simply disagree with the Guidelines' recommended sentence in any particular case and may impose a different sentence based on a contrary view of what is appropriate under § 3553(a). Furthermore, the court "must make an individualized assessment based on the facts presented," and "may not presume that the Guidelines range is reasonable." <u>United States v. Gall</u>, 552 U.S. 38, 50 (2007). Above all, the court's final determination on a sentence must reflect "§ 3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in § 3553(a)(2)." <u>United States v. Kimbrough</u>, 552 U.S. 85, 111 (2007).

Accordingly, this Court must engage in a very specific three step process at sentencing.

1.    An initial calculation of the Guidelines range;

2.    A determination as to whether any departures are appropriate, including an explanation of how the departure affects the Guidelines calculation; and

3.    A consideration of the factors enumerated in 18 <u>U.S.C.</u> § 3553(a), including how this consideration leads to appropriate variances in the Guidelines calculation.

<u>United States v. Tomko</u>, 562 F.3d 558, 567 (3d Cir. 2009).

## B. THE OFFENSE CONDUCT

A case that began with a bang – and much publicity – has now ended with a whimper, in addition to an FBI internal investigation into the misconduct of all agents involved. The characteristics of the instant offense are detailed in the PSR in ¶¶ 17-21. Merlino fully accepts responsibility for his actions in this case. Which is to say, from March 2013 through 2016 he provided prospective bettors with a password to an

internet gambling website which allowed them to bet on sporting events. (PSR ¶ 21). His actions were, in many aspects, limited with little to no financial benefit. Indeed, the PSR reflects that Merlino has little assets, mounting debts, no employment, owns no real property, and recommends that any fine be waived in this case. (PSR ¶¶ 111-112; 119; 121 and pg. 43).

At trial, much to the consternation of the government, there was no evidence that Merlino 'lived the high life' based on his alleged status within the East Coast La Cosa Nostra ("East Coast LCN"). Likewise, there was a dearth of evidence that Merlino was involved in or received illicit funds from any prescription fraud scheme or any other "organized crime" racketeering activity. Instead, the thousands of hours of recordings in this case depict a man who, upon his release from custody in 2011, made every attempt to leave his past criminal associations behind, refused to participate in numerous overtures to engage in criminal activity brought to him by others, was deeply in debt struggling financially, and who was and still is an admitted "degenerate gambler." To better illustrate, the defense has appended to this memo a binder which includes **110** excerpts of recordings made by the government's star witness, John Rubeo ("JR"). **(Exhibit "A").** All of these transcripts fall squarely within the timeframe alleged by the government in the indictment. These transcripts provide the Court with a clearer picture of Merlino's involvement in this case and can be broken down into seven topical categories, as follows:

1.    Costa Rican International Sports ("CRIS")
2.    Gambling
3.    Merlino's Financial Troubles
4.    Merlino Refuses to Engage in Illegal Activity
5.    Pain Cream/Fraudulent Prescriptions
6.    JR Statements to Third-Party's

7.   JR's Attempts to Record Merlino while Intoxicated

More to the point, the following "Executive Summary" contains highlighted

transcripts which directly negate Merlino's involvement in any prescription fraud

scheme, bookmaking operation, or East Coast LCN racketeering activity:

## DEFENSE EXECUTIVE SUMMARY

| TOPIC | TAB | DATE | DESCRIPTION |
|---|---|---|---|
| **PAIN CREAM/FRAUDULENT PRESCRIPTION SCHEME** | 78 | 1/6/2014 | JR tells Merlino that Augie Camacho has 10k coming to him – **Merlino responds he knows zero about the business** (referring to fraudulent prescriptions) |
| | 80 | 3/14/14 | JR says that Sirkin told him that Merlino gets a percentage of what Camacho gets – **Merlino responds never got a cent** |
| | 81 | 3/14/14 | JR to Patty Falcetti and Thomas Carfaro – **Merlino told him he never got a penny from Sirkin; Merlino told him (JR) to leave Sirkin; Sirkin is a BS artist** |
| | 82 | 3/14/14 | Same conversation - JR tells Falcetti and Carfaro that Merlino and Sirkin **are not partners** |
| | 83 | 3/14/14 | JR repeats this to the Special Agent Inzerillo – **JR states that Merlino never got a dime from commissions; Agent cuts him off hangs up** |
| | 84 | 4/1/14 | JR speaking with Nick (Last name unknown – "LNU") – **JR says Merlino and Sirkin are not – "zilch"; Merlino will not do anything illegal.** |
| | 87 | 6/16/14 | Merlino tells JR **it's all a scam – wants nothing to do with it – do not do anything illegal** |
| | 88 | 9/30/14 | Merlino warns JR he should be careful w/ Sirkin and his business – Merlino wants nothing to do with that it |

| | | | |
|---|---|---|---|
| **JR'S OWN WORDS TO 3RD PARTIES** | 17 | 11/22/13 | JR talking to Gallo – tells Gallo that Merlino sent him a long text **about refusing to deal w/JR and his overtures to deal with stolen jewelry** - Merlino refused to get involved with JR |
| | 18 | 11/22/13 | Merlino tells JR he is crazy for dealing with the stolen TV Box scheme – Again, Merlino refuses JR's overtures for illegal schemes |
| | 25 | 3/14/14 | JR to Danny Pagano – JR says he is close w/ Merlino and **he (Merlino) will not do anything illegal** – wait a long time for him to do something illegal; guys come at him (Merlino) all the time w/ schemes **and he refuses** |
| | 26 | 3/14/14 | JR says he has been around Merlino 100 times when people offered to do something illegal; Merlino won't do it. |
| | 30 | 10/18/13 | JR to Pat Capolongo – Merlino done w/ crime; **Merlino refused an offer of 100k to collect a debt.** |
| | 37 | 11/26/13 | JR to Gallo – he (JR) can sell anything; **JR can "sell horseshit"** |
| | 100 | 10/18/2013 | JR to Pat Capolongo – Capolongo says he **does not even know Merlino; would not know Merlino if he was standing right in front of him** |
| | 68 | 2/7/14 | JR to Danny Marino – Merlino and Gallo <u>are not partners</u> |
| | 70 | 2/7/14 | JR to Marino, Cirillo – Marino says he has known Merlino <u>**for 25 years**</u>; <u>**Merlino will bet on anything – he is a degenerate gambler**</u> |
| | 82 | 3/14/14 | JR to Thomas Carfaro – Merlino and Sirkin <u>are not partners</u> |
| | 86 | 4/5/14 | Merlino to JR – Camacho is nuts for dealing with cigarettes; Merlino says nothing illegal; Merlino states anybody doing anything illegal today is nuts |
| | 56 | 11/26/13 | JR to Gallo – Merlino is putting large bets in; Merlino does not like to pay bookmakers |

| | 73 | 4/5/14 | JR to Merlino – Benza robbed them half a point |
|---|---|---|---|
| **MERLINO REFUSES TO ENGAGE IN ILLEGAL ACTIVITY** | 14 | 10/18/13 | Merlino says everything we do is legit; not doing anything illegal anymore; **anybody comes to him with something illegal he is spitting on them** |
| | 16 | 10/18/13 | Merlino to JR – he (Merlino) is going to tell Gallo he is not doing anything illegal; Merlino will not meet anybody. |
| | 17 | 11/22/13 | JR to Gallo – Merlino **does not want to do anything illegal** – talks about the 4-page text re stolen jewelry |
| | 18 | 11/22/13 | Merlino refuses JR's overtures to deal in illegal TV boxes |
| | 24 | 3/14/14 | JR to Pat Falcetti – quotes JM, **"I will not do anything illegal"** |
| | 25 | 3/14/14 | JR to Danny Pagano – quotes JM, **"I'm done, wait a long time"** |
| | 26 | 3/14/14 | JR to Danny Pagano – **100x's people offered illegal – Merlino won't do it** |
| | 27 | 4/1/14 | Merlino to JR – nothing illegal, I work that's it, dead broke, trying to open a restaurant |
| | 28 | 6/16/14 | Merlino to JR – never going back to Philly – work in restaurant |
| | 29 | 6/16/14 | Merlino to JR – guys lie and rob you; Merlino is **tired of hearing other people's schemes** |
| **GAMBLING** | 49 | 10/15/13 | Merlino to JR – he is not a bookmaker; just bettor; Merlino did a lot of time; does not want to do anything against the law |
| | 53 | 10/18/13 | Bookies are worst people in the world; Merlino went to jail for booking; never took a bet in his life; can't stand bookies |
| | 54 | 11/26/13 | Merlino to JR – He (Merlino) is not a bookie |
| | 55 | 11/26/13 | Example of Merlino betting – Illinois v. UNLV |
| | 67 | 2/7/14 | Another example of Merlino betting |
| | 56 | 11/26/13 | JR to Gallo – Merlino is putting in large bets; does not like to pay bookies |
| | 68 | 2/7/14 | JR to Danny Marino – Gallo and Merlino **are not partners** |

| | | | |
|---|---|---|---|
| | 70 | 2/7/14 | Danny Marino to JR – **you can't help a degenerate gambler (referring to Merlino)** |
| **CRIS** | 33 | 11/26/13 | AC gambled CRIS $ - Paid 150k – Broken down valise - $100k – Merlino refused |
| | 37 | 11/26/13 | $500/week – minimum $200 – JR: I can sell "horseshit" |
| | 39 | 12/26/13 | Paperwork – Merlino out of it – Collecting Debt – 0 wrong |
| | 40 | 12/26/13 | Merlino saw Taylor – Asked for paperwork – does not want to be mentioned; Merlino does not even know the guy if he met him on the street |
| | 42 | 1/6/2014 | AC offers Pat $500/week – Merlino says extortion, broke, ignore Pat |
| | 100 | 10/18/13 | Pat Capolongo does not even know "Kid from Philadelphia" |
| **MERLINO'S FINANCIAL TROUBLES** | 2 | 1/6/14 | Merlino is dead broke; will not do anything illegal; bets and that's it |
| | 3 | 1/29/14 | Merlino to JR – can't pay the rent; trying to do everything legit |
| | 4 | 2/7/14 | Danny Pagano to JR – Merlino is **not a guy we want around us**; JR says Merlino is desperate, JR has helped Merlino pay his rent |
| | 5 | 2/10/14 | Merlino is late on rent payment; Merlino is trying to find work and open a restaurant |
| | 6 | 3/13/14 | Merlino does not have a dollar |

## C. RELEVANT CONDUCT

¶¶ 42-44 of the PSR contain the government's theory as it relates to

relevant conduct of Merlino in this case. Specifically, that he participated in a

healthcare fraud scheme with co-defendant Brad Sirkin and others to bribe doctors to

issue unnecessary prescriptions for pain cream, receiving 'kickbacks' in the process.

(PSR ¶ 43). Second, that Merlino engaged in the business of bookmaking and that he

used his status in the East Coast LCN to assist JR and Augie Camacho from paying a

debt owed to the Costa Rica International Sports ("CRIS"). (PSR ¶ 44). In terms of relevant conduct, U.S.S.G. § 1B1.3 states:

> "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range."

U.S.S.G. § 1B1.3, comment., backg'd.

Generally, "the preponderance of the evidence standard satisfies the requisite due process in determining relevant conduct pursuant to the Sentencing Guidelines." United States v. Guerra, 888 F.2d 247, 251 (2d Cir. 1989). The Second Circuit Court of Appeals has also made clear that:

> "The words "relevant conduct" suggest [that] more is required than mere temporal proximity, as the other conduct must be "relevant" and it must occur "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."

United States v. Wernick, 691 F.3d 108, 115 (2d Cir. 2012) (quoting United States v. Ahders, 622 F.3d 115, 122 (2d Cir. 2010).

Here, the jury has spoken and firmly determined that the government failed to establish its burden beyond a reasonable doubt on these counts. Even under a lowered preponderance of the evidence standard, the government has still failed to establish that Merlino was involved in this prescription fraud scheme with co-defendant Brad Sirkin and others. With respect to ¶ 43 of the PSR, it is our position that this should not be considered as 'relevant conduct' at all because it has absolutely nothing to do with the gambling count to which Merlino pled. However, if the Court should entertain such an argument by the government, here is what the actual recordings on this count prove: Merlino repeatedly told JR that he knew nothing about Mr. Sirkin's business and never

received a cent of the proceeds[1].  In fact, Merlino explicitly warned JR of the questionable nature of Mr. Sirkin's business, told him not to get involved with it and leave Mr. Sirkin[2].  Moreover, the star witness in this case is on tape telling third-parties that Merlino and Sirkin **were not partners**[3].  These conversations occur without Merlino present.  Directly undercutting the government's theory of Merlino's involvement, on March 14, 2014 JR calls Special Agent Inzerillo and tells him "**I asked him straight out about him getting commission from the things (referring to fraudulent prescriptions).  Never a dime, he said I haven't gotten a dime from your brother-in-law and I haven't gotten a**..." Agent Inzerillo, fully aware that this conversation is being recorded, cuts JR off, wants none of it and hangs up on him[4].  The logical inference to be drawn from this conversation is that Agent Inzerillo cut off JR because he knew this information was damaging to his case against Merlino.  This recording completely obliterates any notion that Merlino was in involved in a prescription fraud scheme.  *That* is the type of evidence that exists in this case.

With respect to the 'relevant conduct' alleged in ¶ 44 of the PSR, the government theorizes that Merlino used his status in the "East Coast LCN" to engage in illegal sports gambling conduct without fear of having to pay debts he may accrue.  Specifically, through Merlino's alleged booking of wagers from a professional gambler known as "Benza" (from Ohio).  The recordings in this case show the exact opposite. Merlino was clearly a man who enjoyed *placing* bets on sporting events, not the other way around as theorized by the government.   On numerous occasions Merlino expressed to JR his

---

[1] "Executive Summary" at Tabs 78, 80, 81, 87, 101.

[2] Id. at 81, 87, 88.

[3] Id. at Tabs 81, 82, 84.

[4] Id. at Tab 83.

disdain for bookmakers and his refusal to participate in such conduct[5]. Unsatisfied, JR then attempted to bait Merlino into booking others, which Merlino explicitly refused to do[6]. As for "Benza", in or around January 2014 Merlino did not even know who he was, nor did he have any knowledge of the websites utilized by him[7]. Instead, the proofs in this case show that there came a point in time when it was "Benza" who, in fact, was accepting bets from Merlino[8]. As for Merlino's alleged criminal associations with co-defendant Gallo, JR is on tape stating to others (outside of the presence of Merlino) that Mr. Gallo and Merlino **were not partners**, nor did they share in the profits of any illegal gambling operation[9].

JR, a man who is on tape boasting of his own unique ability to "sell horseshit"[10], did just that as it relates to the Costa Rica International Sports ("CRIS") operation. It was JR who gambled away nearly $600,000 of CRIS money, while purchasing several expensive automobiles in the process. He then concocted a story in which he told others that Merlino stepped in and used his influence to settle this debt. Specifically, on November 26, 2013, JR told Donny Petulla, per Merlino's instructions, that he (JR) should no longer pay any debt owed to CRIS[11]. This was a lie and directly contradicted by JR's own words to Merlino on January 6, 2014, wherein he explained that it was Augie Camacho who attempted to settle the debt with CRIS for the payment of $500.00 per week[12]. In reality, Merlino simply told JR to ignore CRIS, refused an overture to

---

[5] Id. at Tabs 47, 48, 49, 50, 51, 52, 53.
[6] Id. at Tab 54.
[7] Id. at Tabs 62 & 63.
[8] Id. at Tabs 72, 73, 99.
[9] Id. at 68 & 69.
[10] Id. at Tab 37.
[11] Id. at Tab 33.
[12] Id. at Tab 42.

step in and collect $100,000 as payment to collect this unlawful debt and told JR he wanted absolutely nothing to do with it[13]. Moreover, Merlino made it clear that he did not even know the individual(s) behind CRIS[14]. This was confirmed by Pat Capolongo during a telephone call to JR, in which Capolongo makes clear that he does not even know who Merlino is nor would he know him if he (Merlino) was standing right in front of him[15].

### D. MERLINO SHOULD RECEIVE A CREDIT TO REFLECT THE 4 MONTHS OF UNNECESSARY INCARCERATION SERVED IN THE THIRD CIRCUIT, ALL OF WHICH OCCURRED WITHIN THE SAME CONSPIRATORIAL TIME PERIOD AND INVOLVED ALLEGED CONTACTS WITH THE SAME CO-DEFENDANTS IN THIS CASE

U.S.S.G. § 5G1.3 states in relevant part:

(b) If... a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct), the sentence for the instant offense shall be imposed as follows:

(1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and

(2) the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment.

On November 1, 2002, the Sentencing Commission added an application note to § 5G1.3 which now explicitly permits a downward departure reflecting a discharged term of imprisonment, which reads as follows:

In the case of a discharged term of imprisonment, a downward departure is not prohibited if subsection (b) would have applied to that term of

---

[13] Id. at Tabs 33, 39, 40.
[14] Id. at Tab 40.
[15] Id. at Tab 100.

imprisonment had the term been undischarged. Any such departure should
be fashioned to achieve a reasonable punishment for the instant offense.
Application Note 7.

United States v. Rosado, 254 F. Supp. 2d 316, 320 (S.D.N.Y. 2003) (holding defendant

was entitled to seven-month credit to account for time spent in state custody on

underlying drug distribution charges). See also United States v. Abreu, 155 F. Supp.3d

211 (2015); United States v. Malloy, 845 F. Supp.2d 475 (N.D.N.Y. 2012) (holding

§5G1.3(b) is to be interpreted as a mandatory credit rather than a discretionary

departure or variance. Thus, it applies even when application would result in a

sentence that was below the defendant's Guideline range).

Between October 24, 2014 and April 23, 2015 Merlino served 4 months of

needless incarceration due to a violation of supervised release filed by Probation in the

Eastern District of Pennsylvania under docket no. 99-00363-01, which is highlighted in

the PSR at ¶ ¶ 76-80. The basis for that violation was Merlino's alleged contact with a

former co-defendant as well as several other convicted felons, specifically Brad Sirkin

and Carmine Gallo. On April 23, 2015, the Third Circuit Court of Appeals entered an

Order reversing the Orders of the District Court for the Eastern District of Pennsylvania

dated October 20 and 24, 2014 respectively and further ordered that Merlino be

released from custody immediately. **(Exhibit "B")**. It is Merlino's position that this term

of imprisonment resulted from an offense that is relevant conduct to the instant matter.

It involved the very same prosecutorial entity – the federal government and its

prosecutors. It occurred squarely within the conspiratorial time period alleged by the

government in this case. Moreover, it occurred in same location (Boca Raton) and

involved his alleged contacts with some of the very same co-defendants in this case,

13

namely Sirkin and Gallo.  As a result, Merlino has now spent 4 months of his life locked in a prison cell -- unnecessarily -- at the hands of overzealous prosecutors.  Time he will never get back.

## E.  THE COURT SHOULD GRANT A DOWNWARD VARIANCE

In accordance with Booker, the Court must consider not only the "real conduct" underlying the offense, rather than merely the elements – it must also view the defendant individually and take the totality of his life and character into consideration when reaching a sentencing decision.  The factors to be considered by the Court in imposing a sentence are set forth in 18 U.S.C. § 3553(a), which requires the Court to impose "a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing – a sentence that is "minimally sufficient" to achieve the purposes of punishment.  United States v. Serafini, 233 F. 3d 758, 776 (3d Cir. 2000).  In Gall v. United States, 552 U.S. 38, 52 (2007), the Supreme Court directed that:

> The sentencing judge [is] to consider every convicted person as an individual in every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue.

With this framework in mind, the 18 U.S.C. § 3553(a) factors to be considered are as follows:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed:

    (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)  to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  the kinds of sentences available;

(4)  the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines..[.];

(5)  any pertinent policy statement..[.];

(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)  the need to provide restitution to any victims of the offense.

As an initial matter, it should be noted that *twice* in the PSR Probation

recommends a sentence at the low end of the sentencing range, specifically stating:

"Based on the history and characteristics of the defendant, the nature and circumstances of the offense, and the sentence meted out to co-defendants in this case, we recommend a guideline sentence **at the low end of the range**."

PSR at pg. 40 (emphasis added).

**Recommendation:**

"We respectfully recommend that Your Honor impose a sentence of 10 months' imprisonment followed by 1 year of supervised release..."

PSR at pg. 42.

## CHARACTERISTICS OF THE DEFENDANT

Mr. Merlino, now 56 years old entering the twilight of his life, was born in

Philadelphia, Pennsylvania to Joseph (father) and Rita (mother) Merlino. Merlino's

father passed away in 2012 and his mother, now 74 years' old, remains in Philadelphia.

Merlino has been married to his wife, Deborah, for 22 years and the couple has two daughters, Nicolette (22) and Sophia (20). Nicolette Merlino recently graduated from Villanova University and plans on attending law school this fall. Sophia currently attends the University of Miami. Despite his past incarceration, Merlino has always maintained a loving relationship with his children and remains actively involved in their lives.

Merlino currently suffers from coronary artery disease. In January 2018, and with the pressure of trial looming, Merlino was admitted to Boca Raton Regional Hospital in Florida. He was subsequently treated "50%-60%" blockage of his arteries and underwent a cardiac catheterization. **(Exhibit "C")** [16]. Merlino currently takes medication for this coronary artery disease as well as high cholesterol.

Throughout his entire life Merlino has suffered from a gambling addiction. While an addiction to gambling cannot serve as a basis for a downward departure, see § 5H1.4, this Circuit has consistently held that it warrants consideration at sentencing. United States v. Harris, No. 74033, 1994 WL 683429, at *4 (S.D.N.Y. Dec. 6, 1994), aff'd, 79 F.3d 223 (2d Cir. 1996) (holding that a pathological gambling disorder, if proven by a defendant to exist and to have resulted in a significantly reduced mental capacity contributing to the commission of the offense of conviction, may qualify in law as a form of "diminished capacity" in the context of a downward departure under § 5K2.13); See also United States v. Liu, 267 F. Supp. 2d 371, 375 (E.D.N.Y. 2003) (holding that where defendant proved by a preponderance of evidence that he suffered from a pathological

---

[16] Exhibit "C" contains two letters authored by Merlino's treating physician, Dr. Barry S. Merrill, dated January 12 and 17, 2018 respectively.

gambling addiction, this condition constituted an impulse control disorder and led to the crime, based on the testimonial and documentary evidence presented).

Merlino's life long battle with this disease began as early as 13 years of age and, unfortunately, has plagued him into adulthood. This addiction colors the background for the offense which Merlino now stands before this Court for sentencing. Indeed, ¶ 106 of the PSR as well as the proofs elicited at trial solidify Merlino's status as a "lifetime, degenerate gambler." The recordings prove that even co-defendants in this case, specifically Danny Marino who has known Merlino for 25 years, referred to him as a "degenerate gambler."[17] Moreover, the recordings are littered with examples of Merlino placing bets on sporting events throughout the time period in the indictment[18]. This addiction served as the catalyst for Merlino's financial troubles. Oftentimes, Merlino found himself unable to pay his rent and relied heavily on financial support from friends and family, including JR[19].

## GENERAL DETERRENCE

While the need for general deterrence exists in virtually all cases, one cannot view Merlino's conduct without acknowledging the drastically changing public landscape on gambling. Indeed, state legislatures and, in fact, the United States Supreme Court have now spoken on this topic. In its recent landmark decision dated May 14, 2018, the United States Supreme Court struck down a federal law prohibiting state sanctioned sports betting, paving the way for legalized sports gambling in the state of New Jersey[20]. This occurred approximately two-weeks following Merlino's guilty plea in this

---

[17] See Exhibit "A" at Tab 70.
[18] Id. at Tabs 49, 53, 54, 55, 56, 67, 73, 74, 97, 99.
[19] Id. at 3, 4, 5, 6, 7, 8, 9, 12, 13, 27.
[20] See Murphy v. NCAA, 584 U. S. _____ (2018) Dkt. 16-476 and 16-477.

matter. As a result of <u>Murphy</u>, the federal government is now prohibited from enacting legislation barring states from legalizing gambling. Today, virtually every casino in New Jersey has a fully operational and legal sports book. Additionally, companies such as Draft Kings and FanDuel have been quick to monetize this new opportunity. Now, one can simply download their app, create an account and begin placing wagers on sporting events within a matter of minutes. **(Exhibit "D")**. Other companies are now jumping on the bandwagon with attempts to monetize this new frontier. For example, new apps such as "BetQL", are now available for download to the entire world and provide bettors with a wealth of inside gambling information including trends, line movement, and the public's betting history and tendencies on virtually every sporting event. (Id.). This app is highly sought after by the public and rated number 42 in terms of downloads in the Apple online app store. In other words, apps like "BetQL" and Merlino's conduct in this case are one in the same and this information is now available to anyone with a smartphone. Thus, it is our position that there is no need for general deterrence in this matter as the public, state legislatures and the Supreme Court have now spoken and expressed a rapidly changing perception when it comes to sports gambling.

## <u>SPECIFIC DETERRENCE</u>

Merlino acknowledges his past criminal history, which is thoroughly detailed in ¶ ¶ 45-75 of the PSR. We do not hide from it and, obviously, expect the Court to give it consideration at sentencing. However, upon his release from federal custody in September 2011, Merlino has made every attempt to leave his past life and associations behind him. He moved to Florida with his wife, leaving the comfort of his past in Philadelphia. The recordings in this case further tell the story: Merlino

repeatedly told JR that he refused to do anything illegal and was in the process finding work through opening a restaurant in Boca Raton[21]. Moreover, Merlino repeatedly rejected JR's overtures into illegal activity, specifically through dealing in stolen jewelry, illegal cigarettes and TV boxes[22]. Additionally, Merlino refused an offer for $100,000 to collect an unlawful debt, stemming from JR's theft of CRIS funds[23]. All of it made a sizable impression on JR because he then began to make it clear to third parties that Merlino simply refused to engage in illegal activity[24]. More to the point, some of Merlino's own co-defendants were recorded in this case expressing their own disassociation with him[25]. By way of example, co-defendant, Pasquale Capolongo was recorded as stating that he would not even know Merlino "if he was standing right in front of him."[26] Co-defendant, Danny Pagano was recorded stating Merlino "is not a guy we want around **us**."[27] These recordings prove Merlino's attempts to distance himself with the associations and activity of his past.

## UNIFORMITY IN SENTENCING

Congress's basic goal in passing the Federal Sentencing Act was to move the sentencing system in the direction of increased uniformity, a uniformity that does not consist simply of similar sentences for those convicted of violations of the same statute, but consists of similar relationships between sentences and real conduct. See United States v. Booker, 543 U.S. 220 (2005). While not mandatory, uniform sentencing of codefendants is a legitimate consideration in sentencing. United States v. Reed, 629 F.

---

[21] "Executive Summary at Tabs 2, 3, 5, 14, 16, 27, 28, 29, 87, 88.
[22] Id. at Tabs 17, 18, 86.
[23] Id. At Tab 30.
[24] Id. at Tabs 17, 24, 25, 26, 30, 82, 84.
[25] Id. at Tabs 4, 70, 100.
[26] Id. at Tab 100.
[27] Id. at Tab 4.

App'x 19, 21 (2d Cir. 2015). The Second Circuit has consistently made an effort to achieve as much as possible uniformity while considering each defendant's respective role in the operation. United States v. Charvat, No. 00 CR 91-05 RWS, 2002 WL 31426014, at *1 (S.D.N.Y. Oct. 28, 2002); see also United States v. MacCaull, No. 00 CR 91-13 RWS, 2002 WL 31426006, at *1 (S.D.N.Y. Oct. 28, 2002).

As noted above, Merlino was *one of only two* defendants (out of 46) in this case to enter a guilty plea to 18 U.S.C. § 1084 (transmission of gambling information), which carries a maximum term of incarceration of 24 months. See § 1084(a). Conversely, 26 defendants entered a guilty plea to 18 U.S.C. § 1955 (conducting an illegal gambling business), which carries a maximum term of 60 months imprisonment. See § 1955(a). The very nature of Merlino's plea agreement is an admission by the government that he played a limited role in this case and was *less culpable* than *virtually all* of his co-defendants. Pages 7-13 of the PSR provide the Court with a chart of the sentences metered out in this case. We submit that it is even more helpful to include a fifth column within this chart, which includes the PSR Sentencing Guideline Range of each co-defendant. In doing so, it becomes clear that nearly every defendant has received a sentence *less than* that which was recommended in their respective PSR. The following sample size is directly on point[28]:

| Defendant No. | Defendant | PSR Sentencing Guideline Range | Disposition |
|---|---|---|---|
| 1 | Pasquale Parrello | 63 months | 9/7/2017: 84 months imprisonment, 3 years supervised release, $15,000 fine and $300 special assessment |

---

[28] On July 27, 2018 and again on August 8, 2018, counsel for Merlino wrote to the attorney for each co-defendant requesting their client's PSR guideline range. This was followed by several follow-up phone calls to each respective defense attorney. To date, counsel has received 36 responses noted in the enclosed chart. However, we would reserve the right to supplement this chart in the event additional responses are received.

| | | | |
|---|---|---|---|
| 3 | Eugene Onofrio | 27-33 months | 7/19/2018: 30 months' imprisonment, 3 years' supervised release, and a $200 special assessment |
| 4 | Conrad Ianniello | **8-14 months**<br><br>**18 U.S.C. § 1955** | **Time served** plus four (4) days, 3 years' supervised release, $100 special assessment |
| 5 | Israel Torres | 46-57 months | 1/8/2018: 60 months' imprisonment, 3 years supervised release, $500 special assessment |
| 6 | Anthony Zinzi | 60 months | 12/8/2017: 48 months' imprisonment, 3 years supervised release, to include 2 months' home confinement, $100 special assessment |
| 7 | Anthony Vazzano | **6-12 months**<br><br>**18 U.S.C. § 1955** | 9/8/2017: **4 months' imprisonment**, 3 years' supervised release, to include 2 months' home confinement, $100 special assessment |
| 8 | Alex Conigliaro | **8-14 months**<br><br>**18 U.S.C. § 1955** | 10/26/2017: **4 months' imprisonment**, 3 years' supervised release, to include 4 months' home confinement, $100 special assessment |
| 9 | Frank Barbone | **6-12 months**<br><br>**18 U.S.C. § 1955** | **Time served**, 3 years' supervised release, to include 6 months' home confinement, $100 special assessment |
| 12 | John Spirito | **21-27 months**<br><br>**18 U.S.C. § 1955** | 12/20/2017: **18 months' imprisonment**, 3 years' supervised release, $200 special assessment |
| 13 | Vincent Casablanca | **4-10 months**<br><br>**18 U.S.C. § 1955** | 6 months' imprisonment, 3 years supervised release, to include 2 months home confinement, $100 special assessment |
| 14 | Marco Minuto | **10-16 months**<br><br>**18 U.S.C. § 1955** | 12/1/2017: **Time served**, 2 years' supervised release, to include 24 months' home confinement, and $100 special assessment |
| 15 | Paul Cassano | **4-10 months**<br><br>**18 U.S.C. § 1955** | 5/25/2018: 8 months' imprisonment, to be served concurrently to 17-cr-89-13 (CS), 3 years' supervised release, $100 special assessment |
| 16 | Daniel Marino | **0-6 months**<br><br>**18 U.S.C. § 1955** | 3/7/2018: **1 year of probation** and a $100 special assessment |

| | | | |
|---|---|---|---|
| 17 | John Lembo | 6-12 months | 8/28/2017: 8 months' imprisonment, 3 years' supervised release, $100 special assessment |
| 19 | Reynold Alberti | 0-6 months | 9/13/2017: Time served (1 day), 2 years' supervised release, $200 special assessment |
| 20 | Vincent Terracciano | 2-8 months | Time served, 3 years' supervised release, to include 2 months' home confinement, $100 special assessment |
| 21 | Joseph Tomanelli | 10-16 months | 5 months' imprisonment, 3 years' supervised release, to include 5 months' home confinement, $3,000 fine and $100 special assessment |
| 22 | Agostino Camacho | **4-10 months**<br><br>**18 U.S.C. § 1955** | 1/9/2018: **Time served**, 2 years' supervised release, to include 4 months' home confinement, $100 special assessment |
| 24 | Anthony Cassetta | **8-14 months**<br><br>**18 U.S.C. § 1955** | 11/2/2017: **3 months imprisonment**, 3 years' supervised release, to include 3 months' home confinement, $100 special assessment |
| 25 | Nicholas Vuolo | 0-6 months | 10/6/2017: Time served (1 day). 3 years' supervised release, $100 special assessment |
| 26 | Bradford Wedra | 10-16 months | 4 months' imprisonment, 3 years' supervised release, to include 6 months' home confinement, $2,500 fine and $100 special assessment |
| 27 | Michael Poli | **6-12 months**<br><br>**18 U.S.C. § 1955** | **Time served (1 day)**, 3 years' supervised release, to include 6 months' home confinement, $2,500 fine, $100 special assessment |
| 28 | Pasquale Capolongo | **8-14 months**<br><br>**18 U.S.C. § 1955** | 2/28/2018: 18 months' imprisonment, 3 years' supervised release, and a $100 special assessment |
| 29 | Anthony DePalma | **4-10 months**<br><br>**18 U.S.C. § 1955** | 3/16/2018: **Time served**, 3 years' supervised release, to include 6 months' home confinement, $100 special assessment |
| 30 | John Tognino | **4-10 months**<br><br>**18 U.S.C. § 1955** | 9/7/2017: **Time served (1 day)**, 3 years' supervised release, to include 6 months' home confinement, $100 special assessment |
| 31 | Mark Maiuzzo | 60 months | 10/12/2017: 60 months' imprisonment, 3 years supervised release, $100 special assessment |

| | | | |
|---|---|---|---|
| 32 | Joseph Dimarco | **6-12 months**<br><br>18 <u>U.S.C.</u> § 1955 | 12/15/2017: **3 months' imprisonment**, 3 years' supervised release, to include 3 months' home confinement, and $100 special assessment |
| 34 | Richard LaCava | **6-12 months**<br><br>18 <u>U.S.C.</u> § 1955 | 10/5/2017: **Time served (1 day)**, 2 years' supervised release, to include 4 months' home confinement, $100 special assessment |
| 35 | Vincent Thomas | 0-6 months | 9/26/2017: 1-year probation and $100 special assessment |
| 36 | Anthony Camisa | **64-70 months**<br><br>18 <u>U.S.C.</u> § 1955 and 18 <u>U.S.C.</u> § 924(c)(1)(A)(i) | 10/2/2017: **6 months on Ct. 1** and 60 months on Ct. 2 to run consecutive, total of 66 months, 3 years' supervised release, $200 special assessment |
| 37 | Frank Trapani | **4-10 months**<br><br>18 <u>U.S.C.</u> § 1084 | 12/1/2017: **Time served (1 day)**, 1 year of probation, $100 special assessment |
| 38 | Anthony Cirillo | **4-10 months**<br><br>18 <u>U.S.C.</u> § 1955 | **Time served**, 2 years' supervised release, to include 4 months' home confinement, $100 special assessment |
| 40 | Joseph Falco | **6-12 months**<br><br>18 <u>U.S.C.</u> § 1955 | 10/26/2017: **Time served** (1 day), 3 years' supervised release, to include 4 months' home confinement, $100 special assessment |
| 42 | Ralph Santaniello | 24-30 months | 12/21/2017: 30 months' imprisonment, 3 years supervised release, $100 special assessment |
| 44 | Craig Bagon | **4-10 months**<br><br>18 <u>U.S.C.</u> § 1955 | 12/12/2017: **Time served** (1 day), 2 years' supervised release, $100 special assessment |
| 45 | Bradley Sirkin | 37-46 months | Rule 20 transfer to U.S. District Court for the Middle District of Florida |

21 out of the 36 co-defendants noted above (with the exception of Parrello, Onofrio, Torres, Zinzi, Lembo, Alberti, Terracciano, Tomanelli, Vuolo, Wedra, Maiuzzo, Thomas, Santiello and Sirkin), pled guilty to 18 <u>U.S.C.</u> § 1955. Out of those 21 co-defendants, 18 received a sentence *less than* that which was recommended in their

respective PSR, which equates to nearly 86%.  As it relates to Merlino, the government

offered a plea to a reduced charge under § 1084(a) because the recordings prove

Merlino was not involved in any bookmaking, prescription fraud, or RICO scheme, as

outlined above.  Co-defendant, Frank Trapani, was the only other defendant to receive

such an offer from the government.  On December 1, 2017, Mr. Trapani received a

sentence of **time served**.  It is respectfully submitted that in keeping with the goal of

uniformity in sentencing and in light of the transcripts attached which highlight Merlino's

limited involvement in this case, this Court sentence Merlino to time served with a

period of home confinement.


Dated: 10|1|18

JACOBS & BARBONE, P.A.

Edwin J. Jacobs, Jr.
Jacobs & Barbone, P.A.
1125 Pacific Avenue
Atlantic City, NJ 08401
(609) 348-1125 (phone)
(609) 348-3774 (fax)

*Attorneys for Defendant Joseph Merlino*