

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

October 10, 2018

**BY ECF**

Honorable Richard J. Sullivan
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

  Re: *United States* v. *Joseph Merlino*, S44 16 Cr. 522 (RJS)

Dear Judge Sullivan:

  The defendant in this case, Joseph Merlino, is scheduled to be sentenced on October 17, 2018, having pleaded guilty, pursuant to a plea agreement, to the unlawful transmission of wagering information in interstate commerce, in violation of Title 18, United States Code, Section 1084. Merlino's guilty plea followed the conclusion of a trial that ended in a hung jury. At trial, Merlino faced charges of participating in a racketeering conspiracy, participating in a conspiracy to commit healthcare fraud, and conspiring to conduct an illegal gambling business, in addition to the charge of transmitting wagering information to which he ultimately pleaded guilty.

  The Government respectfully submits this letter in advance of Merlino's sentencing and in response to the sentencing submission that his counsel has filed, dated October 1, 2018 (the "Defense Submission" or "Def. Mem."). Both the parties and the Probation Department calculate a Guidelines range of 10 to 16 months' imprisonment, and the statutory maximum sentence is 24 months' imprisonment. The defense asks for a sentence of time served, and Probation recommends a sentence of 10 months. The Government respectfully disagrees, and submits that a sentence of 24 months is appropriate in this case.

## Factual Background

*Criminal History*

  Merlino has an extensive criminal history. He was convicted in 1983 of aggravated assault and possession of a weapon for an unlawful purpose; he was convicted in 1989 of conspiracy and theft of an interstate shipment; and he was convicted in 2001 of participating in a racketeering conspiracy. (PSR at ¶¶ 46-59.) Merlino served substantial periods of incarceration following each of these convictions. He has also incurred lesser convictions for violating the Casino Control Act

of New Jersey and resisting arrest. In addition to the crimes of which he has been convicted, Merlino has been indicted and proceeded to trial on a number of other charges of which he was acquitted. In 2003 he was indicted on two murder charges, of which he was ultimately acquitted at trial. (PSR at ¶ 90.) In 1999 he was indicted for assaulting a federal officer, of which he was also acquitted at trial. (*Id.*) And in 2001, while he was convicted at trial of participating in a racketeering conspiracy, he was acquitted at that same trial of three counts of murder and two counts of attempted murder. (PSR at ¶ 59.) The PSR sets forth in detail the leading role that Merlino played in the Philadelphia mafia from 1990 to 2000.

Following his conviction on racketeering charges in 2001, Merlino was incarcerated until September 2011. In October 2014, he was sentenced to a period of four months' imprisonment for violating the terms of his supervised release. He served that time at the beginning of 2015. (PSR at ¶ 58.) The violation was later vacated on appeal on jurisdictional grounds. (Def. Mem. Ex. B.)

*Offense Conduct*

In August 2016, Merlino was one of 46 defendants charged in this case with participating in a racketeering conspiracy comprised of members of La Cosa Nostra operating together along the East Coast of the United States (described in the Indictment as the "East Coast LCN"). With the exception of a cooperating witness, who pleaded guilty to the racketeering charge as part of his cooperation agreement, all of the defendants eventually pleaded guilty to crimes that had been committed in the context of the racketeering conspiracy, ranging from operating illegal gambling businesses to engaging in extortion, but not to the top count of racketeering conspiracy. The lead defendant in the case, Pasquale Parrello, pleaded guilty to extortion conspiracy and was sentenced to 84 months' imprisonment.

Merlino did not plead guilty in the first instance, and proceeded to trial on charges of racketeering conspiracy, healthcare fraud conspiracy, conspiracy to conduct an illegal gambling business, and interstate transmission of wagering information. The majority of the evidence that the Government presented at trial focused on the healthcare fraud conspiracy. With respect to that conspiracy, the evidence established that Merlino and others agreed to bribe doctors to write unnecessary prescriptions for a pain cream, in order to earn a percentage of the resulting exorbitant insurance payouts. The evidence at trial also established that Merlino was involved in the operation of an illegal gambling business, including on the bookmaking side. Finally, the evidence at trial established that Merlino acted as a member of the East Coast LCN.

In the Defense Submission, Merlino contends that the evidence at trial did not prove by a preponderance of the evidence that Merlino was involved in the healthcare fraud scheme. (Def. Mem. at 9.) In making this contention, Merlino asserts that he never actually received a cut of the proceeds of the healthcare fraud; that he urged John Rubeo to "leave" one of the masterminds of the healthcare fraud, Brad Sirkin; and that Rubeo did not characterize Merlino and Sirkin as

"partners." (*Id.* at 10.) Merlino also refers the Court to a number of recorded phone calls that he claims support his denial of involvement in the healthcare fraud. In attempting to dissociate himself from the healthcare fraud conspiracy, Merlino essentially repeats arguments that he made to the jury at trial. The Government respectfully submits that the preponderance of the evidence at trial plainly showed that Merlino was involved in the conspiracy to commit healthcare fraud. Notably, Merlino did not need to receive actual proceeds from the healthcare fraud for this to be so, nor did he need to be "partners" in any formal or official sense with Brad Sirkin.

In his canvass of the evidence presented at trial, Merlino omits the recording in which he told Rubeo, "I says, and then try to get, maybe get the doctors, whatever the guy, his piece and they can start by writing, they ain't write in a while" (GX 262B) – a clear reference to paying doctors ("get the doctors . . . his piece") to incentivize them to write prescriptions for the pain cream ("they can start by writing"). He omits many other pieces of evidence as well, including his acknowledgment to Rubeo that the supposed patients who were going to doctors' offices to get pain cream prescriptions were "your friends" (Merlino's words) and "not legitimate" (Rubeo's words) (GX 121B; Tr. at 657); his statement to Rubeo, "You want [Camacho] to be able to deal directly with Brad [Sirkin] . . . that's no problem. Done." (GX 275B; Tr. at 610-11), an example of Merlino agreeing to facilitate direct dealings between Camacho and Brad Sirkin for purposes of effectuating the healthcare fraud; his statement to Rubeo, "I want to get paid" (GX 121B) which Rubeo explained was a reference to obtaining a share of the commission checks for pain cream prescriptions (Tr. at 654-55); his advising Rubeo to provide Sirkin with "the four other doctors" (GX 121E), which Rubeo explained was a reference to doctors Rubeo had told Merlino that he had found to write scripts for the pain cream (Tr. at 663); and his asking Rubeo to give him something every month, to which Rubeo responded "he's coming Friday," meaning that Camacho was coming to Florida to receive a commission check, part of which would be given to Merlino (Tr. at 624). Merlino also omits reference to the recording of Donny Petullo Jr. stating that "Joey gets 4 [percent]" when discussing who will earn money from commissions for pain cream prescriptions (GX 276A) and to his complaint to Rubeo upon receiving a check from him and being told that the amount would have been more but for the percentage that had to go to the doctor, "Fuck the doctors, they're doctors. They're rich" (GX 147A), an acknowledgment that he understood that doctors were being paid to write pain cream prescriptions. Based on these pieces of evidence and on the balance of the evidence that was presented at trial, the Government believes that Merlino's contention that he was not involved in the healthcare fraud conspiracy should be rejected.

Merlino also contests in his sentencing submission that he was involved in booking wagers, claiming that his direct involvement in gambling operations was strictly on the betting side. (Def. Mem. at 10.)[1] Again, the Government respectfully submits that the preponderance of the evidence at trial proved that Merlino was, in fact, involved on the bookmaking side. Among other things,

---

[1] Merlino acknowledges that he transmitted wagering information interstate by providing prospective bettors with a password to an internet gambling website which allowed them to bet on sporting events. (Def. Mem. at 3-4.)

Rubeo testified that Merlino had a "sheet" with bookmaker Anthony Cirillo, meaning that he had an agreement with Cirillo to earn a percentage of Cirillo's bookmaking profits. (Tr. at 627.) Merlino's protestations that he did not actually receive the money from Cirillo do not negate this testimony that an agreement existed, and Merlino's recorded comment to Rubeo that the money from Cirillo's bookmaking operation is negligible because it gets "whack[ed] . . . up three ways" corroborates it. And with respect to whether Merlino contributed to the booking of wagers made by the professional gambler Benza, as Rubeo testified, or whether Merlino strictly placed bets with Benza, as Merlino contends, Donny Petullo Sr.'s text message to Rubeo asking whether they should "close accounts" because they cannot pay Benza (GX 702) is revealing. It is the bookmaker who would close the accounts, not the gambler, and this message and others on Rubeo's phone that were presented at trial corroborate Rubeo's testimony that Merlino, Rubeo and Petullo Sr. booked Benza's wagers. The machinations that ensued in order to avoid paying Benza, including Merlino's deployment of another member of the East Coast LCN, Carmine Gallo, to get the message across to Benza that he would not be paid, also put into relief the racketeering context in which the conduct of Merlino and his co-conspirators took place.

Merlino's trial ended in a hung jury, and he subsequently pleaded guilty to a single count of transmitting wagering information interstate.

## Discussion

The statutory maximum sentence that can be imposed on Merlino is 24 months' imprisonment, and in this case that is the appropriate sentence. Merlino argues that his involvement in the healthcare fraud conspiracy should not be considered for purposes of sentencing because it has "absolutely nothing to do with the gambling count to which Merlino pled," citing Section 1B1.3 of the Sentencing Guidelines. (Def. Mem. at 9.) This argument is inapposite, as the Government is not advocating for a higher Sentencing Guidelines range based on relevant conduct as defined in Section 1B1.3. Indeed, the Guidelines range here is stipulated to in a plea agreement, and is based solely on the count of conviction and Merlino's criminal history. However, Merlino's participation in a healthcare fraud conspiracy is plainly appropriate for the Court to consider in fashioning a sentence for Merlino that is sufficient but not greater than necessary to accomplish the purposes set forth in Title 18, United States Code, Section 3553(a)(2). *See, e.g.*, *United States v. Concepcion*, 983 F.2d 369, 387-88 (2d Cir. 1992) ("[T]he sentencing court could take into account any information know to it . . . [including] information that the defendant had engaged in conduct that was the subject of an acquittal.") His participation in a healthcare fraud conspiracy bears on the history and characteristics of the defendant, *see* 18 U.S.C. § 3553(a)(1), and it also forms a part of the circumstances of the offense of conviction, *see id*. Merlino was engaging in the interstate transmission of wagering information not in isolation, but in the context of other criminal conduct. His simultaneous participation in various forms of criminal conduct suggests an opportunism in finding unlawful means of making money, and also speaks to the length of sentence that is needed to deter Merlino from future criminal conduct and to protect the public from additional crimes by

Merlino. *See* § 3553(a)(2)(B) & (C). Merlino's involvement in multiple types of criminal activity at the same time also speaks to the length of sentence that is necessary in order to promote respect for the law. *See* § 3553(a)(2)(A). The healthcare fraud conduct that was proven at trial should be considered in fashioning the appropriate sentence for Merlino.

The factors set forth in Section 3553(a) militate in favor of a sentence of 24 months' imprisonment here, as opposed to the sentence of 10 months recommended by Probation or the sentence of time-served requested by Merlino. First, the circumstances of the offense are such that a sentence tailored to the count of conviction taken in isolation would be too low. Merlino did not engage in the transmission of wagering information as a deviation from an otherwise lawful lifestyle; rather, it was one of several means he was using, in addition to the healthcare fraud conspiracy and bookmaking conduct, to make money through illegitimate activity. A full picture of the offense includes the fact that it was part of a larger fabric of illegal activity that Merlino was engaging in at the same time.

Second, Merlino's history and characteristics, as well as the need to deter Merlino from future criminal conduct, counsel in favor of a sentence of 24 months. Merlino has a long history of entanglements with the criminal justice system, none of which deterred him from engaging in the offense conduct here. Merlino's prior convictions, including for racketeering and aggravated assault, are extremely serious, and he has served a lengthy period of time in jail without the effect of deterring him from future criminal conduct. Moreover, Merlino has faced indictment and trial on even more serious charges of which he has been acquitted, but the experience of standing trial twice for murder did not sufficiently discourage him from engaging in illegal activity. In discussing Merlino's history and characteristics, the Government readily acknowledges that the seriousness of his criminal conduct has diminished over time. Merlino's offense conduct here, and his participation in the healthcare fraud conspiracy and bookmaking activity, was not violent. But the deterrent effect of Merlino's prior and significant brushes with the criminal justice system has only been partial. The sentences of time served or 10 months recommended by Merlino and Probation, respectively, would not meaningfully deter Merlino from participating in exactly the kind of criminal conduct that he engaged in here. In the Government's view, a sentence of less than 24 months would lead Merlino to believe that his continued participation in non-violent criminal activity will not have meaningful consequences for him, and that it is enough that he has ratcheted down the nature of his illegal conduct.

Relatedly, the Government believes that a sentence of 24 months is necessary to promote respect for the law. Merlino's own sentencing submission bears this out, in part, by arguing that in light of recent changes in the legal landscape regarding gambling, there is no need for general deterrence in this case and therefore Merlino's sentence should be lower than it might otherwise be. (Def. Mem. at 17-18.) A sentence of time served or 10 months may endorse this message, that in effect Merlino's offense conduct was not a big deal. That message would be incorrect. As Merlino acknowledges elsewhere in his submission, compulsive gambling is a dangerous addiction that can have a significant deleterious effect on a person's life. Merlino's offense conduct

facilitated that danger.  The fact that at the same time, he was also facilitating that danger by engaging in bookmaking activities, compounded the risk that he helped cause for other people. The sentence imposed should reflect the importance of abiding by the laws regulating gambling activities, no matter how stringent or relaxed they are and no matter what the prospect is that they will change.

For the reasons discussed above, the Government respectfully submits that an above-Guidelines sentence of 24 months is appropriate in this case.  Merlino argues that if he is given a sentence of incarceration, he should receive a credit of 4 months against that sentence for the time he served in early 2015 for the violation of supervised release that was overturned on appeal, after Merlino had already served his sentence, on jurisdictional grounds.  The Government does not believe that such a credit is warranted here.  Assuming *arguendo* that the conduct underlying Merlino's violation of supervised release, which involved contact with convicted felons, including a former co-defendant of Merlino's, would qualify as relevant conduct under Section 1B1.3 with respect to the offense conduct here, it is nevertheless the policy under the Sentencing Guidelines that "the sanction imposed upon revocation is to be served consecutively to any other term of imprisonment imposed for any criminal conduct that is the basis of the revocation." U.S.S.G. § 7B1.1 (Introductory Commentary).  That is because the point of a revocation of supervised release is to "sanction primarily the defendant's breach of trust . . . . [A]s a breach of trust inherent in the conditions of supervision, the sanction for the violation of trust should be in addition, or consecutive, to any sentence imposed for the new conduct." U.S.S.G. § 7A3(b).  There are good reasons to follow that policy here.  Merlino was on supervised release in a different district, underscoring the distinction between the interest in sanctioning a breach of trust, which concerned the Eastern District of Pennsylvania, and in sanctioning the offense conduct, which concerned the Southern District of New York.  And Merlino has a history of committing new crimes after being released from jail, highlighting the significance of the breach of trust that revocations of supervised release are intended to sanction.  It is appropriate in this case for any sentence of imprisonment that the Court imposes on Merlino to be consecutive to the 4 months he served for violating the conditions of his supervised release in the Eastern District of Pennsylvania.[2]

---

[2] Merlino's offense conduct, and his participation in the healthcare fraud conspiracy, also occurred while he was on supervised release.

Honorable Richard J. Sullivan
October 10, 2018
Page 7 of 7

      For the reasons discussed above, the Government respectfully submits that a term of 24 months' imprisonment would be sufficient, but not greater than necessary, to further the statutory objectives of sentencing in this case.

                                                  Respectfully submitted,

                                                  GEOFFREY S. BERMAN
                                                  United States Attorney

                              By:      /s/
                                                    Max Nicholas
                                                    Lauren Schorr
                                                    Andrew Chan
                                                    Assistant United States Attorneys
                                                    (212) 637-1565/2299/1072

cc:  Edwin Jacobs, Esq.